In re VETERANS' AIR EXPRESS CO., Inc.
No. 6582a.

District Court, D. New Jersey.
March 19, 1948.

Administration at its central office at Washington, D. C.

Briefly summarized, the facts of the case are that Veterans' Air Express Company, Inc., purchased two 4-engine Douglas Aircraft from the United States in April and May 1946. Each of the aircraft carried a Registration number issued by Civil Aeronautics Administration to Veterans' Air Express Company, Inc. The sale of aircraft bearing Registration No. NC 58003 was recorded on April 10, 1946, the bill of sale having been recorded as Document No. 185684 and the chattel mortgage in favor of the United States as Document No. 185685. The sale of aircraft bearing Registration No. NC 57777 was recorded on May 24, 1946, the bill of sale having been recorded as Document No. 196041 and the chattel mortgage in favor of the United States as Document No. 196042. There was no other recordation of the bills of sale or of chattel mortgages.

After delivery of the aircraft to Veterans' Air Express Company, Inc., it turned over the airplanes to the petitioner, Matson Navigation Company for repairing, overhauling, reconditioning and conversion. The consent of the United States was not sought or obtained. Prior to the filing of the petition for reorganization of Veterans' Air Express Company, Inc., charges in favor of Matson Navigation Company in the sum of approximately $116,898.10 had accrued. After the filing of the petition for reorganization, the petitioner, Matson Navigation Company, incurred additional charges of $30,722.19 for the account of the debtor and of the Trustees in Reorganization.

The chattel mortgages of the United States represent an unpaid obligation due upon the aircraft of approximately $122,187.51.

The petitioner, Matson Navigation Company, seeks to impress a first, prior and paramount lien to the extent of $30,722.19 for charges accrued after the filing of petition for reorganization of the debtor, together with such additional charges as might have to be incurred to complete the aircraft. In addition, the petitioner seeks

Carpenter, Gilmour & Dwyer and Samuel M. Coombs, Jr., all of Jersey City, N. J., for petitioner Matson Nav. Co.

Crummy & Considine and William A. Considine, all of Newark, N. J., for trustee.

Edgar H. Rossbach, U. S. Atty., and Roger M. Yancey, Asst. U. S. Atty., both of Newark, N. J., H. G. Morrison, Asst. Atty. Gen., and Aaron B. Holman, Atty., Dept. of Justice, and W. Tobin Lennon, Asst. General Counsel, War Assets Administration, both of Washington, D. C., for the Government.

MEANEY, District Judge.

This matter comes before the Court on a petition brought on for hearing by an order to show cause by Matson Navigation Company to impress a first, prior and paramount lien upon certain aircraft purchased by the debtor, Veterans' Air Express Company, Inc., from the United States of America, acting by and through War Assets Administration, subject to chattel mortgages in favor of the United States recorded in the Civil Aeronautics

to impress a possessory lien under the provisions of Section 3051 of the California Civil Code in the amount of $116,898.10 for work done by it prior to the date of the petition for reorganization but after, of course, the recordation of the chattel mortgages by the United States in the Civil Aeronautics Administration.

The United States appears in opposition to the petition, contending that upon recordation of the chattel mortgages in favor of the Government with the Civil Aeronautics Administration a lien superior to any lien which might be created by State Law was effected.

In the field of air transportation Congress early undertook to preempt the field of regulation and to deal with the entire field of activity by enactment of the Civil Aeronautics Act, Act of June 23, 1938, c. 601, 52 Stat. 977, 49 U.S.C.A. § 401 et seq., as amended. Section 3 of the Act, 49 U.S. C.A. § 403, states that "There is hereby recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable air space of the United States." The declaration of policy stated by Congress in Section 2 of the Act, 49 U.S.C.A. § 402, recites that among its purposes is the encouragement and development of civil aeronautics and "of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense." Under the provisions of Section 1 of the Act, 49 U.S. C.A. § 401, "operation of aircraft" or "operate aircraft" is defined in subsection (26) as "the use of aircraft, for the purpose of air navigation and includes the navigation of aircraft. * * *" Subsection (15) defines "civil aircraft of the United States" as any aircraft "registered as provided in this Act."

Section 501 of the Civil Aeronautics Act, 49 U.S.C.A. § 521, so far as may be pertinent here, is as follows:

"(a) It shall be unlawful for any person to operate or navigate any aircraft eligible for registration if such aircraft is not registered by its owner as provided in this section, or * * * to operate or navigate within the United States any aircraft not eligible for registration: Provided, That aircraft of the national defense forces of the United States may be operated and navigated without being so registered if such aircraft are identified, by the agency having jurisdiction over them, in a manner satisfactory to the Administrator of Civil Aeronautics. The Administrator of Civil Aeronautics may, by regulation, permit the operation and navigation of aircraft without registration by the owner for such reasonable periods after transfer of ownership thereof as the Administrator of Civil Aeronautics may prescribe.

"(b) An aircraft shall be eligible for registration if, but only if—

"(1) It is owned by a citizen of the United States and is not registered under the laws of any foreign country; or

\* \* \* \* \* \*

"(c) Upon request of the owner of any aircraft eligible for registration, such aircraft shall be registered by the Administrator of Civil Aeronautics and the Administrator of Civil Aeronautics shall issue to the owner thereof a certificate of registration.

"(d) Applications for such certificates shall be in such form, be filed in such manner, and contain such information as the Administrator of Civil Aeronautics may require."

Finally, Section 503 of the Act, 49 U.S. C.A. § 523, provides as follows:

"(a) The Board shall establish and maintain a system for recording all conveyances affecting the title to, or interest in, any civil aircraft of the United States.

"(b) No conveyance made or given on or after the effective date of this section, which affects the title to, or interest in, any civil aircraft of the United States, or any portion thereof, shall be valid in respect of such aircraft or portion thereof against any person other than the person by whom the conveyance is made or given, his heir or devisee, and any person having actual notice thereof, until such conveyance is recorded in the office of the secretary of the Board. Every such conveyance so recorded in the office of the sec-

retary of the Board shall be valid as to all persons without further recordation. Any instrument, recordation of which is required by the provisions of this section, shall take effect from the date of its recordation, and not from the date of its execution.

"(c) No conveyance shall be recorded unless it states the interest in the aircraft of the person by whom such conveyance is made or given or, in the case of a contract of conditional sale, the interest of the vendor, and states the interest transferred by the conveyance, and unless it shall have been acknowledged before a notary public or other officer authorized by law of the United States, or of a State, Territory, or possession thereof, or the District of Columbia, to take acknowledgment of deeds.

"(d) The Board shall record conveyances delivered to it in the order of their reception, in files to be kept for that purpose, and indexed to show—

"(1) the identifying description of the aircraft;

"(2) the names of the parties to the conveyance;

"(3) the time and date of reception of the instrument and the time and date of recordation thereof;

"(4) the interest in the aircraft transferred by the conveyance; and

"(5) if such conveyance is made as security for indebtedness, the amount and date of maturity of such indebtedness.

"(e) The Board is authorized to provide by regulation for the endorsement upon certificates of registration, or aircraft certificates, of information with respect to the ownership of the aircraft for which each certificate is issued, for the recording of discharges and satisfactions of recorded instruments and other transactions affecting title to, or interest in, aircraft, and for such other records, proceedings, and details as may be necessary to facilitate the determination of the rights of parties dealing with civil aircraft of the United States.

"(f) The person applying for the issuance or renewal of an airworthiness certificate for an aircraft with respect to which there has been no recordation of ownership as provided in this section shall present with his application such information with respect to the ownership of the aircraft as the Board shall deem necessary to show the persons who are holders of property interests in such aircraft and the nature and extent of such interests."

[By Reorganization Plan No. 3 of June 30, 1940, 5 U.S.C.A. following section 133t, the functions of aircraft registration were transferred to the Administrator of Civil Aeronautics Administration.]

It may be here noted that "conveyance" as used in Section 503 is defined in Section 1(18) of the Act as a "bill of sale, contract of conditional sale, mortgage, assignment of mortgage, or other instrument affecting title to, or interest in, property."

Pursuant to the authority granted in Sections 308, 501 and 503 of the Civil Aeronautics Act, 49 U.S.C.A. §§ 458, 521 and 523, the Administrator of Civil Aeronautics Administration issued regulations concerning registration of aircraft and recordation of aircraft ownership. Under the provisions of paragraphs 501.20 and 501.21 of the Regulations of February 10, 1943, effective March 31, 1943, in effect at the time of the transactions here, an applicant for registration was required to mail or deliver a duly executed application to the Administrator with proof that the applicant is a citizen of the United States and is owner of the aircraft. Under the provisions of Regulation 501.22 "aircraft will be deemed to be registered upon the date that the documents * * * are received by the Administrator or his authorized inspector." Regulation 503, dealing with the recordation of aircraft ownership, is particularly pertinent here. It is as follows:

"*503.1 Recordation required.* All conveyances affecting the title to, or interest in, any aircraft registered under the provisions of the Civil Aeronautics Act of 1938, as amended, shall be executed upon the application form prescribed by the Administrator, or a form deemed by the Administrator to be its equivalent, and shall be recorded with the Administrator.

"503.2 Eligibility. A conveyance shall be eligible for recordation only if:

"(a) It is accompanied by a duly executed application for registration, together with all the documents required by section 501.2 of the Regulations of the Administrator of Civil Aeronautics: *Provided,* That this paragraph shall not apply to conveyance affecting an interest in, but not title to the aircraft, or conveyances transferring ownership to a person not eligible to obtain registration; and

"(b) It is accompanied by a Certificate of Ownership for the aircraft which is the subject of the conveyance, if such certificate has been issued by the Administrator, * * * *Provided,* That, in the event of the loss or destruction of such Certificate of Ownership, the owner shall submit in lieu thereof proof satisfactory to the Administrator that such certificate has been destroyed or lost; and

"(c) It affects an aircraft currently registered under the terms of the Civil Aeronautics Act of 1938, as amended; and

"(d) It states the interest in the aircraft of the person by whom such conveyance is made or given, or in the case of a contract of conditional sale, the interest of the seller; and

"(e) It states the interest transferred by the conveyance; and

"(f) It is acknowledged before a Notary Public or other officer authorized by law of the United States, or of a State, Territory or possession thereof, or the District of Columbia, to take acknowledgment of deeds.

"503.3 *Notice of transfer.* The registered owner of any aircraft, within five days after the conveyance of such aircraft, or other disposition thereof, shall furnish the Administrator, upon the prescribed form, notice of sale or other disposition of the aircraft.

"This amendment shall become effective March 31, 1943."

In view of the novelty of the question presented in this case, the Court has deemed it necessary to set forth in detail the statutory and regulatory framework of aircraft ownership and conveyance. It is clear that the Congress has prescribed the only way in which aircraft may be transferred and in which liens upon aircraft may be duly recorded. In this manner, all persons dealing with aircraft are upon full legal notice concerning possible liens and are charged with the duty of inquiry at the central recording office of the Civil Aeronautics Administration with respect to any aircraft in which they might be concerned.

There has been some intimation that because the planes in question are not available at the moment, and may not be intended, for inter-state flights, Federal laws are not applicable. Such a consideration cannot be determinative of this issue.

In attempting to establish the scope of application of Congressional regulation of aircraft, there arises the question of just how far the regulatory right of the separate States of the Union is involved, and whether the Federal government in its legislation may override the control of the states in dealing with aircraft used exclusively in intra-state operations. The immediately pertinent recent opinion is that found in the case of Aviation Credit Corp. v. Gardner, 174 Misc. 798, 22 N.Y.S.2d 37, Supreme Court of New York, Erie County. In that case, the Court held that the powers of Congress, under the Commerce Clause of the Federal Constitution, may not be invoked as to purely intrastate enterprises, and indicated that insofar as commercial aviation craft used solely in intrastate commerce are concerned, Congress was without power to exercise dominant control, and State Statutes, and more particularly liens on such craft created by State Statutes are paramount. That in purely inter-state commerce, the States reserved to themselves the right to regulate and control such commerce is indisputable, since "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people" as is provided in the United States Constitution. Const. Amend. 10.

However, the matter of control of aircraft and air navigation would seem by

logical interpretation of the Commerce Clause to be resident in the Congress of the United States, despite the fact that in many instances such aircraft may be used solely for operations within the confines of a single State.

In establishing the right of the Congress to legislate on all matters concerning the traversal of navigable waters by craft of whatever description, the Supreme Court has repeatedly pointed out that Commerce includes navigation. In Gilman v. Philadelphia, 3 Wall. 713, 70 U.S. 713, 18 L.Ed. 96, the court, at pages 724, 725, unequivocally stated:

"Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress. This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the States or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders. For these purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England.

"It is for Congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided."

This doctrine has been reiterated, time and time again, until the established constitutional basis for Congressional control over navigable rivers and the craft operating thereon is beyond cavil, carping or question. Gilman v. Philadelphia, supra; Gibbons v. Ogden, 9 Wheat. 1, 190, 22 U.S. 1, 190, 6 L.Ed. 23; Escanaba Company v. Chicago, 107 U.S. 678, 682, 2 S.Ct. 185, 27 L.Ed. 442; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 328, 56 S.Ct. 466, 80 L.Ed. 688; United States v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co., 312 U.S. 592, 595, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064. See also Southern Pacific Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915.

In Escanaba Company v. Chicago, supra, the Court says [107 U.S. 678, 2 S.Ct. 188]: "The power vested in the general government to regulate interstate and foreign commerce involves the control of the waters of the United States· which are navigable in fact, so far as it may be necessary to insure their free navigation, when by themselves or their connection with other waters they form a continuous channel for commerce among the states or with foreign countries."

The test of whether navigable waters are subject to Congressional control is clearly set forth in most of the cases cited. If the waters afford channels of communication among the States or for commerce with foreign countries, they are ipso facto subject to the constitutionally grounded power for the governing precepts of Congress.

■ Since then, Congress has prime control over navigation on the waters of the United States, as described above, a logical extender of the rationale of the Supreme Court in specifically applying the Commerce Clause to regulation of traffic on navigable waters, posits the proposition that Congress has control over navigation in the air, since such navigation constitutes commerce as surely as does carriage of passengers and goods by water. That fact seems so self-evident that this court finds no need for elucidation of the thought. The only further comment required is to point out the incontestible conclusion that Congress has full power to control all aviation activity, since there is no section of the navigable circumambient atmosphere of the United States which is not part of "a continuous channel for commerce among the states or with foreign countries". Escanaba Company v. Chicago, supra. The analogy between the two modes of travel, by water and by air, is exact. And the reasons which are

compulsive for establishing Congressional control of water navigation as a constitutionally established prerogative are, if anything, more cogent with regard to navigation of the air. There can be no air pocket so closed and confined within the geographical limits of any state as to be incontiguous to the interstate and international highways of the air.

Unquestionably there are certain fields of endeavour in which local viewpoints, local situations and local interests are determining factors. Others, however, transcend the limitations of parochial interest and become part of the concern of all of the people of America, rather than any one State. Unquestionably, attempted restriction of Federal rights by over clamorous and undue insistence on States rights add nothing to the importance of the State, and by hampering the activities of National Government destroys the effectiveness of its operation in those matters which concern all of the people.

 This Court has already had occasion to hold in United States v. Cardinale Warehouse Corp., D.C., 65 F.Supp. 760, 762, that no State Government may create "a right for an individual citizen of that state paramount to the right of the Federal Government as to the same subject matter" and "granted that the United States may exercise a right, that right may not, in the absence of specific warrant by Congress, be restricted, crimped, cabined or confined by any other authority. To hold otherwise would be to contend that any one of the United States possesses the power to limit the proper functions of the Federal Government." This Court there held, in a suit by the United States to recover property upon which a warehouseman claimed a lien under state law, that "no lien may be exerted against the government without its consent, any more than may the government be sued without its consent, for reasons at least as potent, if not more so, for such immunity."

In United States v. Allegheny County, 1943, 322 U.S. 174, 182, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209, the Supreme Court stated:

"Every acquisition, holding, or *disposition* of property by the Federal Government depends upon proper exercise of a constitutional grant of power. * * *

"Procurement policies so settled under federal authority may not be defeated or limited by state law. The purpose of the supremacy clause was to avoid the introduction of the disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any State. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; Board of Com'rs of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Carpenter v. Shaw, 280 U.S. 363, 50 S. Ct. 121, 74 L.Ed. 478; Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S. Ct. 387, 61 L.Ed. 791; United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107; see D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956; Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694; Federal Land Bank v. Bismarck Lumber Co., 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65. *Federal statutes may declare liens in favor of the Government nad establish their priority over subsequent purchasers or lienors irrespective of state recording acts.* Detroit Bank v. United States, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304; United States v. Snyder, 149 U.S. 210, 13 S.Ct. 846, 37 L.Ed. 705. * * *" (Emphasis supplied.) See also United States v. Wm. R. Trigg Co., 115 Va. 272, 277, 278, 78 S.E. 542.

 Since, then, this court is of the opinion that the regulatory provisions of recordation in accordance with the Civil Aeronautics Act is within the scope of proper application of Federal Law in a field of Federal competence, the lien claimed by the United States of America is senior to any claim established under a State Law affecting the same object.

No condition or requirement, inconsistent with the expressed will of Congress in matters such as this over which it has constitutional authority, may be established by any state in derogation of the rights and interests of the United States in the proper conduct of the affairs of government. This last statement needs no monotonous recital of authorities for its substantiation.