In re GULL AIR, INC., Debtor.

Bankruptcy No. 87–10333–JNG.

United States Bankruptcy Court, D. Massachusetts.

May 18, 1987.

---

Charles R. Bennett, Jr., George M. Kelakos, Riemer & Braunstein, Boston, Mass., for movant.

Stephen F. Gordon, Peter J. Haley, McCabe/Gordon, Boston, Mass., for debtor.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

On March 10, 1987, Gull Air, Inc. ("Gull Air" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Less than two weeks later, on March 19, 1987, the First National Bank of Dubuque (the "Bank") filed an emergency motion for relief from stay, seeking possession of an aircraft identified as an Embraer Model EMBA 110–P1, License Number N870AC on three alternative grounds: 1) that the Bank had leased the aircraft to Gull Air and the lease had expired; 2) the Debtor was unable to insure the aircraft so the aircraft was at risk; and 3) the Debtor has no equity in the property. The Court conducted a preliminary hearing on the Bank's motion on March 20, 1987. On April 16, 1987, the Court conducted an evidentiary hearing and heard oral arguments. At that time, the Debtor indicated that it opposed the Bank's motion on the grounds that it is the owner of the aircraft pursuant to the terms of a written agreement dated April 22, 1986.

## FACTS

The aircraft that is the subject of this dispute was formerly part of the Iowa bankruptcy estate of American Central Airlines, Inc. ("ACA"). The aircraft was subject to the Bank's valid and perfected, purchase money security interest and one other preferential lien. In an effort to generate revenues from the aircraft while negotiations between the Bank and the trustee in bankruptcy of ACA were ongoing, the Bank, acting as an intermediary, arranged a lease between Gull Air and the trustee of ACA. The lease, dated April 22, 1986, was for a term of nine months from April 22, 1986 to January 22, 1987. Lease payments were set at $9,000 per month. Additionally, paragraph 13 of the lease provided an option to extend the lease "under the same terms and conditions on a month to month basis ... by the mutual consent of the parties."

On the same day that the lease was executed, the Bank and Gull Air entered into a purchase and sale agreement. Gull Air, as the buyer, agreed to pay the Bank $825,000 for the aircraft, which sum was to be paid in full at the time of delivery. The purchase and sale agreement identified the expected delivery date as January 22, 1987, the same day the lease terminated.

Following the successful conclusion of the Iowa bankruptcy trustee's preference claim against the holder of the second lien on the aircraft, the trustee and the Bank entered into a Stipulation and Application to Compromise Claim that subsequently was approved by the Iowa bankruptcy court after notice and a hearing. In accordance with the Iowa court's order approving the stipulation, the trustee, on January 20, 1987, executed an aircraft bill of sale in favor of the Bank.

The lease was to terminate and the parties were to close the sale of the aircraft on January 22, 1987. Prior to that date, however, Dale P. Repass ("Repass"), Vice President, Commercial Lending, wrote to the principals of Gull Air, on behalf of the Bank, informing them that the Bank was ready, willing and able to perform under the purchase agreement. On January 22,

1987, Gull Air, through its principals, orally requested a two month extension of the lease and a postponement of the closing until March 22, 1987. The Bank agreed. In a letter to the Debtor's principals dated January 22, 1987, Repass stated:

> First National Bank is agreeable to extend both the lease and Purchase Agreements until March 22, 1987 if each of you, as guarantors of the Purchase Agreement, agree that said extension shall not change, modify, or amend either Gull Air Inc's or your individual liabilities to perform under the Purchase Agreement dated April 22, 1986.
>
> If you consent to the above terms, please sign, date and return a copy of this letter to me in the envelope provided. Upon receipt, we will officially notify Gull Air of the extension of the Lease and purchase agreements.

Despite the Bank's request that the guarantors consent to the terms specified in the Bank's January 22, 1987 letter, the principals of Gull Air did not respond. Subsequently, on March 12, 1987, two days after the Chapter 11 filing, Repass sent the guarantors notices of default and demands for payment no later than March 22, 1987. Repass indicated in his letter that the Bank stood ready to deliver title to the aircraft. Notably, Gull Air has been in possession of the aircraft continuously since April 22, 1986.

## DISCUSSION

Section 362(d) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest; or

> (2) with respect to a stay of any act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). Subsection (g) of section 362 allocates the burden of proof on the issues raised by subsection (d). The party requesting the relief from stay has the burden of proof on the issue of the debtor's equity in property, whereas the opposing party has the burden of proof on all other issues. 11 U.S.C. § 362(g). Thus, it is clear that the Bank has the burden of proving that the Debtor has no equity in the subject aircraft.

The Bank's argument is three fold. It maintains that there was no sale of the aircraft to the Debtor by the Bank because title did not pass to the Debtor. The Bank relies on section 2–106(1) of the Uniform Commercial Code which states that a sale "consists of the passing of title from the seller to the buyer for a price." Iowa Code § 554.2106 (West 1967 & Supp.1987.) [1]

Since title to an aircraft is at issue, the Bank next maintains that federal law must be examined for guidance. The Bank, citing *In re Veteran's Air Express Co.*, 76 F.Supp. 684 (D.N.J.1948), and *Crescent City Aviation, INc. v. Beverly Bank*, 139 Ind.App. 669, 219 N.E.2d 446 (1966), asserts that section 503(a) of the Federal Aviation Act of 1958, 49 U.S.C.A. § 1301 et seq. (West 1976 & Supp.1987), requires the recordation of an instrument of conveyance with the Federal Aviation Administration the ("FAA") before title can pass and that courts have recognized that section 503(a) of the Act provides the only way in which an aircraft may be transferred and liens on aircraft recorded.

■ Despite this bold assertion, the Court is persuaded that section 503 of the Federal Aviation Act is more limited in its scope since its purpose "is to protect per-

---

1. The parties do not dispute the fact that the purchase and sale agreement between the Debtor and the Bank should be construed and interpreted in accordance with Iowa law and that

Article 2 of the Uniform Commercial Code, which is codified at Iowa Code Ann. § 554.1101 et seq., applies.

sons who have dealt on the faith of the FAA register, as to whom it would be fraud to give effect to unrecorded interests to their detriment." *CIM International v. United States*, 641 F.2d 671, 674 (9th Cir. 1980). For example, section 503(c) provides:

> No conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid in respect of such aircraft, aircraft engine or engines, propellers, appliances, or spare parts *against any person other than the person by whom the conveyance or other instrument is made or given*, his heir or devisee, or any person having actual notice thereof, until such conveyance or other instrument is filed for recordation in the office of the Secretary of Transportation:

49 U.S.C. § 1403(c) (emphasis supplied). *See also Philko Aviation, Inc. v. Shacket*, 462 U.S. 406, 409–10, 103 S.Ct. 2476, 2478, 76 L.Ed.2d 678 (1983) ("[E]very aircraft transfer must be evidenced by an instrument, and every such instrument must be recorded, before the rights of innocent third parties can be affected."); *In re Air Vermont, Inc.* 44 B.R. 433, 438 (Bankr.D. Vermont 1984) ("Congress intended to preempt any state law under which a transfer without a recordable conveyance would be valid as against innocent transferees or lienholders who have recorded.") It is thus apparent to the Court that the Federal Aviation Act is not determinative of the rights of the parties with respect to the instant ownership dispute because rights of innocent third parties are not at stake.

The Bank does not concede the weakness of its argument under section 503. However, it also asserts that title to the aircraft did not pass to the Debtor within the meaning of section 2–401 of the Uniform Commercial Code. In this regard, the Bank maintains that either section 2–401(1) or (3), not section 2–401(2) as the Debtor maintains, is applicable to the instant case because, in its view, the evidence presented at the April 16, 1987 hearing and the testimony of Repass established that the parties were in agreement that the Bank would pass title to the aircraft to the Debtor at the time of payment by means of an aircraft bill of sale suitable for recording with the FAA.

The Debtor maintains that the Bank's retention of the bill of sale or other documents does not defeat the operation of section 2–401(2). The Debtor indicates it obtained title on April 22, 1986 or, alternatively on January 23, 1987 at the conclusion of the lease. The Debtor emphasizes the fact that the Bank allowed Gull Air to retain physical possession of the aircraft on and after January 23, 1987 and only contested possession after the filing of the Chapter 11 when it made demand on the principals of the Debtor.

Section 2–401 of the Uniform Commercial Code provides in relevant part:

> Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of the Article and matters concerning title become material the following rules apply:
>
> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), *title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.*
>
> (2) Unless otherwise explicitly agreed *title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place;*

*and* in particular and despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

(3) *Unless otherwise explicitly agreed where delivery is to be made without moving the goods,*

(a) *if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents;* or

(b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

Iowa Code Ann., § 544.2401 (West 1967 & Supp.1987).

■ Clearly, section 2–401(3) does not help the Bank. That section pertains to goods held by warehousemen or bailees. Comment 4 to section 2–401 reveals that "[i]f shipment is not contemplated subsection (3) turns on the seller's final commitment, i.e. the delivery of documents or the making of the contract." What constitutes a "document of title" is defined at subsection 1–201(15) of the Uniform Commercial Code. That subsection provides:

"Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

Iowa Code Ann., § 554.1201(15) (West 1967 & Supp.1987). In view of these considerations, the Court is unable to conclude that the document of title referred to in section 2–401(3) is equivalent to the aircraft bill of sale the Bank intended to deliver to Gull Air at the time of closing. *See Dairylea Co-op., Inc. v. Rossal,* 64 N.Y.2d 1, 483 N.Y.S.2d 1001, 473 N.E.2d 251 (1984).

With respect to section 2–401(1), the Court notes that the Bank, in its post-trial memo, conveniently overlooks unambiguous language in that section in arguing that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." The language ignored by the Bank limits any retention or reservation of title to a reservation of a security interest pursuant to Article 9. With respect to the relationship between subsections 2–401(1) and (2), the court in *Matter of Bosson,* 432 F.Supp. 1013 (D.Conn.1977) set forth that relationship as follows:

Although § 2–401(2) begins with the phrase '[u]nless otherwise explicitly agreed,' the prior subsection places limits on the parties contractual freedom. Specifically, § 2–401(1) negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained. Similarly, § 2–401(1) prohibits the passage of title prior to the identification of the goods in question to the contract. In between these extremes, however, the parties may by contract specify the point at which title passes.

*Id.* at 1020 n. 24. *But see Bowman v. American Home Assurance Co.,* 190 Neb. 810, 213 N.W.2d 446 (1973) (explicit agreement can prevent passage of title beyond the time of delivery).

■ The written purchase and sale agreement between the Bank and the Debtor, which, parenthetically, was executed before the Bank even had title to the aircraft, makes no mention of the Bank retaining title. In its post-trial memorandum, the Bank argues that there was a clear understanding of the parties with respect to the

 

Bank's retention of title. Assuming *arguendo* the correctness of the *Bowman* decision, the Court, after careful review of the documents and the testimony of Repass, is, however, unable to conclude that the parties entered into an explicit agreement that would prevent title from passing on January 23, 1987 after the termination of the lease. In view of the fact that the lease and closing extensions were ineffective because of the failure of the Debtor's principals to provide the requisite guarantees, the Court has little choice but to conclude, particularly in view of the unequivocal language of the purchase and sale agreement, that the parties intended a sale on January 22, 1987 and that title passed to Gull Air on or immediately after that date because Gull Air was in possession of the aircraft. *See generally Northwestern Flyers, Inc. v. Olson Brothers Manufacturing Co.,* 679 F.2d 1264, 1270 (8th Cir. 1982); *Herington Livestock Auction Co. v. Verschoor,* 179 N.W.2d 491 (Iowa 1970). Accordingly, the Bank is in the position of a creditor with at most an unperfected security interest with an unsecured claim against the bankruptcy estate in the amount of $825,000. *See generally In re Schmidt,* 53 B.R. 70, 71 (Bankr.E.D.Pa. 1985).

The Court notes that its sympathy is with the Bank. However, the Court is compelled to observe that the Bank did obtain the guarantees of the Debtor's principals and surely did not lack the resources to more adequately protect its interests.

In view of the foregoing, the Court finds that the Bank is not entitled to relief from the automatic stay and hereby denies its Motion for Relief from Stay.

So ordered.