## In re E.SPIRE COMMUNICATIONS, INC., et al., Debtors.

### No. 01–974 (RB).

United States Bankruptcy Court, D. Delaware.

Sept. 13, 2002.

Joelle E. Polesky, Smith, Katzenstein & Furlow LLP, Wilmington, DE, for 360networks (USA), Inc.

Domenic E. Pacitti, Maria Aprile Sawczuk, Rebecca E. Street, Saul Ewing LLP, Wilmington, DE, Jeffrey C. Hampton, Saul Ewing LLP, Philadelphia, PA, for Debtors and Debtors in Possession.

## MEMORANDUM OPINION ON OBJECTION TO DEBTORS' SALE MOTION[1]

RONALD BARLIANT, Bankruptcy Judge.

Before the Court is the Objection of 360networks (USA), Inc. to Debtors Expedited Motion For Orders Under Sections 105, 363 and 365 of the Bankruptcy Code of the Bankruptcy Code and Bankruptcy Rules 6004, 6006 and 9014 ("Sale Motion")[Doc. No. 1221]. The primary issue is whether e.spire Communications, Inc. ("Debtors") had title to certain Fiber Projects and Conduit Projects and therefore sold them pursuant to the order that granted the Sale Motion. The Court sustains the objection of 360networks since it, rather than Debtors, has title to the Projects. The Debtors, therefore, could not sell the Projects.[2]

### I. BACKGROUND [3]

On March 22, 2001, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[4] On June 28,-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and (b)(2)(A).

3. The facts are from the Motion, the parties' briefs and exhibits attached thereto as no hearing was held on this matter and the parties did not stipulate to any facts.

4. All statutory references herein are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, unless otherwise noted.

2001 360networks filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York, Case No. 01–13721(ALG).

### A. The Agreements

On or about April 13, 2001, ACSI Network Technologies, Inc. ("ACSI"), one of the Debtors in this case, and 360networks entered into two agreements: (i) a Fiber Purchase Agreement (the "Fiber Agreement") for the sale and purchase of a fiber optic cable project located in the Washington, D.C. metropolitan area; and (ii) a Conduit Purchase Agreement (the "Conduit Agreement" and collectively with the Fiber Agreement, the "Agreements") for the sale and purchase of a conduit system project located in the Atlanta, Georgia metropolitan area.

According to the terms of the Fiber Agreement, ACSI agreed to sell and 360networks agreed to buy the Fiber System. The transfer of title to 360networks is governed by § 4.3 of the Fiber Agreement and states, in relevant part:

> Upon execution of the Cable System SOW [Statement of Work] and payment of the first installment of the Cable System Fees in the amount of fifty percent (50%) of the applicable Cable System Fee, as set forth in the applicable Cable System SOW, ACSI will (a) provide Purchaser with a bill of sale ... pursuant to which all right, title and interest in the Cable System Project whether then owned or hereafter acquired will be transferred from ACSI to Purchaser free and clear of liens, claims, encumbrances, interests and rights of others except for ACSI's purchase money security interest as provided herein; and (b) retain a purchase money security interest in the Cable System Project until ACSI receives from Purchaser payment in full of the Cable System Fees applicable to such Cable System Project. Purchaser shall promptly deliver to ACSI UCC 1 financing statements and other documents evidencing such purchase money security interest so that ACSI can timely perfect its interest in the Cable System Project.

[Exhibit A at § 4.3 (Doc. No. 1375) ].

Additionally, pursuant to the Conduit Agreement, ACSI agreed to sell and 360networks to buy the Conduit System. The Conduit Agreement has a § 4.3 regarding transfer of title which is identical to § 4.3 of the Fiber Agreement. [Exhibit B at § 4.3 (Doc. No. 1375) ].

On April 13, 2001, the Statement of Work ("SOW") documents were executed by the parties and, on May 4, 2001, 360networks paid ACSI fifty percent (50%) of the aggregate purchase price for the Projects, in the amount of $1,774,200.00 [Affidavit of R. Gustafson, ¶¶ 7–10 (Doc. No. 1415); Exhibit D (Doc. No. 1375) ].

### B. The D.C. Project

The backbone portion of the DC Project ("DC Backbone") was completed by ACSI and on May 15, 2001, ACSI tested the DC Backbone to assure it met the specifications required by the Fiber Agreement. On May 16, 2001, ACSI provided 360networks with a System Acceptance Notice ("SAN") for the DC Backbone. 360networks never signed the SAN for the DC Backbone. According to the Debtors, ACSI required that the DC Backbone be accepted before the remaining portions of the DC Project could be connected to the DC Backbone and delivered to 360 Networks [Debtors' Brief, fn. 3 (Doc. No. 1778) ].

In addition, 360networks required ACSI to obtain Court approval of the transaction. As late as June 6, 2001, Thomas Dillon of 360networks stated that 360networks was awaiting Delaware Bankruptcy Court documentation before 360networks

would complete the acceptance and process a bill of sale [Debtors' Exhibit D–1 (Doc. No. 1778) ].

### C. The Atlanta Project

The backbone portion of the Atlanta Project (the "Atlanta Backbone") was completed by ACSI and on April 23, 2001, ACSI tested the Atlanta Backbone to assure it met the specifications required by the Conduit Agreement. On April 25, 2001, ACSI provided 360networks with a SAN for the Atlanta Backbone. The Debtors assert that 360networks was required to obtain a railroad permit to allow for the completion of the remaining portion of the Atlanta Project [Debtors' Brief, fn. 4]. The Debtors further assert that 360networks never procured the permit, and therefore ACSI was unable to complete the remaining portions of the Atlanta Project [Debtors Brief, fn. 4]. 360networks never signed the SAN for the Atlanta backbone.

By way of letter dated May 16, 2001 (Debtors' Exhibit D–2), 360 networks stated that since it was not present at the testings, 360networks "cannot accept the conduit system at this time." The letter further stated that "the expected course of action is that the conduit system be retested with the proper advance notice given to 360 [5], allowing us to have an inspector present ... 360networks is willing to help expedite the test and acceptance process in order to facilitate system completion" [Debtors' Exhibit D–2].

Again, 360networks was concerned with Bankruptcy Court approval of the sale. Tom Dillon from 360networks stated in an e-mail, dated May 21, 2001, to ACSI that:

[i]t is 360networks intention to proceed with acceptance at this time. However, due to ACSI's bankruptcy status, we need to work with your legal coun[se]l to file a motion with the bankruptcy court to approve the sales contemplated under the Fiber Purchase Agreement and Conduit Purchase Agreement as transactions in the ordinary course of ACSI's business. It is imperative that the court approve these transactions as such and that 360networks receive assurances there from [sic] that ACSI is approved to convey title to such assets free and clear to 360networks. Once this is accomplished, we can execute the bill of sale and transfer funds.

[Debtors' Exhibit D–3].

### D. Subsequent Events and 360networks' Bankruptcy Filing

On June 28, 2001, 360networks filed for Chapter 11 bankruptcy protection. On June 29, 2001, 360networks requested that ACSI halt all efforts on its behalf until 360networks could sort out the details surrounding its filing. The Debtors allege that 360networks suggested that it may not want to purchase the entire Projects, but rather smaller pieces and less strands of fiber [Debtors' Brief, at 5–6 (Doc. No. 1778) ]. Furthermore, 360networks has never used any portion of the Projects. 360networks has never "lit" the fibers, that is attached equipment to the fibers or conduit to send traffic along the fibers.

On July 3, 2001, the Debtors filed a Notice of Proposed Sale of Certain Assets to 360networks (USA) Inc. Pursuant to Order Under Sections 105 and 363 of the Bankruptcy Code Approving Procedures

---

**5.** The Conduit Agreement provides in part:
ACSI shall notify Purchaser by facsimile with reasonable advance notice of the date and time of the commencement of the ATP [Acceptance Test Plan], which notice shall in no event be less than ten (10) days prior to the commencement of such ATP. Purchaser shall have the right but not the obligation to observe the tests [Conduit Agreement, § 3.1].

to Sell Certain Assets Free and Clear of Liens, Claims and Encumbrances Without Further Court Approval [CM/ECF Doc. No. 485, NIBS Doc. No. 481]. There were no objections by any parties by the July 11, 2001, deadline and pursuant to the procedures set in place, the transactions were deemed approved and the parties were authorized to proceed. 360networks, however, had already filed for bankruptcy protection.

## II. POSITIONS OF THE PARTIES

The grounds asserted for the objection is that 360networks paid ACSI, via wire transfer, the amount which represented fifty percent (50%) of the purchase price and pursuant to the Agreements received all right, title and interest in and to the Projects. The fact that ACSI may have retained a purchase money security interest in the Projects is of no consequence and has no effect on 360networks' title to the Projects. Payment alone is sufficient to pass title, notwithstanding ACSI's failure to provide a bill of sale.

The Debtors argue that title to the projects never passed to 360networks for two reasons: (i) a bill of sale was specifically contemplated by the Agreements and one was never given to 360networks; and, (ii) 360networks never provided ACSI with UCC–1 financing statements, as required by the Agreements, to allow ACSI to perfect a purchase money security interest in the Projects and this was to occur contemporaneously with the bill of sale and title transfer. In the alternative, Debtors' assert that even if 360networks obtained title upon payment, 360networks rejected the goods, and therefore title reverted back to ACSI. 360networks refutes the rejection argument.

## III. DISCUSSION

### A. Applicable State Law

The Agreements each specifically state in § 18.6 that "this Agreement shall be interpreted, construed and governed in accordance with the laws of the State of New York, irrespective of principles of conflicts of laws" [Exhibits A & B, § 18.6 (Doc. No. 1372) ]. Since the Agreements provide a choice of law and neither party has raised an issue as to governing law, the Court will apply New York law in construing and interpreting the Agreements as to whether 360networks has title to the Projects.

### B. Transfer of Title

■ New York's current version of § 2–401 regarding passing of title in the sale of goods, provides, in part:

Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods, (a) if the seller is to deliver a document of title, title passes

at the time when and the place where he delivers such documents; or (b) if the goods are at the time of the contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

(4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale".

N.Y.U.C.C. § 2–401.

The argument set forth by 360networks is that, in interpreting § 2–401, courts have consistently recognized that delivery of a bill of sale is not necessary to convey title. Furthermore, 360networks argues, that bills of sale do not constitute "documents of title" within the meaning of § 2–401(3).

In order to determine whether a bill of sale is included in § 2–401's treatment of documents of title, one must first look to how that term is defined in the U.C.C. The New York U.C.C. version of § 1–201 provides:

> "Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

N.Y.U.C.C. § 1–201(15). That section is made applicable to Article 2 by N.Y.U.C.C. § 2–103(4). *Dairylea Cooperative, Inc. v.*

*Rossal,* 483 N.Y.S.2d 1001, 1006, 473 N.E.2d 251, 256 (N.Y.App.1984). A bailee is defined by N.Y.U.C.C. § 7–102(1)(a) as "the person who by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them."

The Official Comment to N.Y.U.C.C. § 1–201(15) contemplates documents of title as those involved in the transport and warehousing of goods. Specifically, Comment 15 provides, in relevant part:

> by making it explicit that the obligation or designation of a third party as "bailee" is essential to a document of title, this definition clearly rejects any such result as obtained in *Hixson v. Ward,* 254 Ill.App. 505 (1929), which treated a conditional sales contract as a document of title. Also the definition is left open so that new types of documents may be included ... truck transport has already opened up problems ... there [also] lie[s] ahead air transport and such probabilities as teletype transmission of what may some day be regarded commercially as "Documents of Title". The definition is stated in terms of the function of the documents with the intention that any document which gains commercial recognition as accomplishing the desired result shall be included within its scope.

N.Y.U.C.C. § 1–201 Comment 15.

The Bankruptcy Court for the District of Massachusetts was correct in stating that § 2–401(3) "pertains to goods held by warehousemen or bailees." *In re Gull Air,* 73 B.R. 820, 824 (Bankr.D.Mass.1987). The Bankruptcy Court in *Gull Air,* through interpreting the § 1–201(15) definition, was "unable to conclude that the document of title referred to in section 2–401(3) is equivalent to the aircraft bill of sale the Bank intended to deliver to Gull Air at the time of closing." *Gull Air,* 73

B.R. at 824, *citing, Dairylea Co-op v. Rossal,* 483 N.Y.S.2d 1001.

In *Dairylea,* the Court of Appeals found that § 2–401(3) did not apply in determining whether title passed to a tanker truck. The first reason the Court of Appeals gave, and important to the present inquiry, was that a certificate of title was not a "document of title" within the definition provided in § 1–201(15). *Id.* Specifically, the Court referred to the last sentence, regarding the issuance to or from a bailee, and found that a certificate of title to a vehicle was not covered by § 1–201(15) and thus § 2–401(3) was inapplicable. *Id.*

■ The Court is satisfied that a bill of sale, as was required under the Agreements here, does not fall within the definition of a "document of title", as that term is defined in N.Y.U.C.C. § 1–201(15). The failure of ACSI to provide a bill of sale was "at most a reservation of title, and as such acted as a reservation of a security interest in the property." *Young v. Golden State Bank,* 560 P.2d 855, 858, 39 Colo. App. 45, 48 (1977). Since the bill of sale is not a document of title, the Court finds that § 2–401(3)(a) does not apply in determining title to the Projects at issue here.

Furthermore, the Agreements at issue here explicitly provide at § 4.3 that upon completion of Statement of Work documents and payment of fifty percent of the purchase price all right, title and interest was to transfer to 360networks after ACSI provided a bill of sale. [Exhibits A & B at § 4.3]. First, 360networks has shown that on April 13, 2001, the Statement of Work documents were executed by the parties [Affidavit of R. Gustafson, ¶¶ 7–10 (Doc. No. 1415) ]. Second, a Bank of America wire transfer notification naming ACSI as the beneficiary of a wire transfer in the amount of $1, 744,200.00 [Exhibit D (Doc. No. 1375) ] is sufficient proof of payment of fifty percent of the purchase price.

360networks performed the conditions required by § 4.3 of the Agreements to transfer title in the Projects. There is no dispute that 360networks did not perform the conditions.

The Debtor cannot properly rely on its own failure to timely deliver the bills of sale to defeat the passage of title to 360networks. *Kaplon–Belo Assoc., Inc. v. Tae Hee Kim,* 535 N.Y.S.2d 95, 96, 145 A.D.2d 413, 414 (N.Y.App.Div.1988), *appeal denied,* 74 N.Y.2d 615, 549 N.Y.S.2d 960, 549 N.E.2d 151 (1989)(holding "[w]here 'a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure.' ") (citations omitted). The Court cannot allow the Debtor to escape its obligations under the Agreements which it entered into by supporting its failure to perform under such Agreements.

Moreover, the bill of sale would have been merely a ministerial act. The purpose of the bill of sale here was simply to evidence the parties' compliance with the Agreements. The importance of the bill of sale is the entitlement to it, which 360networks has shown.

■ The Debtors' argument that there was no transfer of title because 360networks never provided the requisite UCC financing statements is unpersuasive. The Debtors' state in their opposition brief "in order to effect a transfer of title and retention of a security interest, the transactions contemplated a simultaneous exchange of a UCC–1 financing statement along with the passage of the bill of sale" [Debtors' Brief at 8]. The Agreements actually state that (a) title transfers after 360networks fulfills its conditions and ACSI provides a bill of sale and (b) ACSI retains a purchase money security interest [Exhibits A & B, § 4.3]. In the next sentence of § 4.3, it is

stated that "Purchaser shall promptly deliver to ACSI UCC–1 financing statements and other documents evidencing such purchase money security interest ... so that ACSI can timely perfect its interest ..." [Exhibits A & B, § 4.3]. Furthermore, the Agreements contain no language stating that passage of title to the Projects was conditioned upon delivery of financing statements. Thus the only language in the Agreements states that 360networks was to deliver financing statements sometime after title was to have already passed to 360networks.

### B. 360networks Rejection of the Projects

 The Debtors assert, in the alternative, that 360networks rejected the Projects and therefore do not hold title. N.Y.U.C.C. § 2–602 provides "[r]ejection of goods must be within a reasonable time after their delivery or tender ... [i]t is *ineffective unless the buyer seasonably notifies the seller.*" (emphasis added). There is nothing before the Court showing that 360networks rejected the Projects by timely notice.

The Debtors attached correspondence between the parties as exhibits to its pleadings [Debtors' Exhibit D–1—D–3]. The correspondence does not constitute a rejection. In fact, the correspondence is more likely to support an argument that the parties intended to complete the transaction but needed to resolve certain issues. Transfer of title, however, did not depend on resolution of those issues. Likewise, the Debtors argument that 360networks never "lit" the fiber or utilized the Projects is beside the point since the Agreements did not provide that 360networks was required to take any such action as a condition to transfer title.

### IV. *CONCLUSION*

For the foregoing reasons, the objection of 360networks to the Debtors' sale motion is hereby sustained.

The parties shall submit an order within ten (10) days.