## ESCANABA COMPANY v. CHICAGO.

1. The Chicago River and its branches, although lying within the limits of the State of Illinois, are navigable waters of the United States over which Congress, in the exercise of its power under the commerce clause of the Constitution, may exercise control to the extent necessary to protect, preserve, and improve their free navigation; but until that body acts, the State has plenary authority over bridges across them, and may vest in Chicago jurisdiction over the construction, repair, and use of those bridges within the city.

2. There is nothing in the ordinance of July 13, 1787, or in the subsequent legislation of Congress, that precludes the State from exercising that authority.

APPEAL from the Circuit Court of the United States for the Northern District of Illinois.

The case is fully stated in the opinion of the court.

*Mr. Alexander T. Britton, Mr. Jehiel H. McGowan,* and *Mr. Homer Cook* for the appellant.

*Mr. Frederick S. Winston, Jr.,* for the appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

The Escanaba and Lake Michigan Transportation Company, a corporation created under the laws of Michigan, is the owner of three steam-vessels engaged in the carrying trade between ports and places in different states on Lake Michigan and the navigable waters connecting with it. The vessels are enrolled and licensed for the coasting trade, and are principally employed in carrying iron ore from the port of Escanaba, in Michigan, to the docks of the Union Iron and Steel Company on the south fork of the south branch of the Chicago River in the city of Chicago. In their course up the river and its south branch and fork to the docks they are required to pass through draws of several bridges constructed over the stream by the city of Chicago; and it is of obstructions caused by the closing of the draws, under an ordinance of the city, for a designated hour of the morning and evening during week-days, and by a limitation of the time to ten minutes, during which a draw may be left open for the passage of a vessel, and by some of the piers in the south branch and fork, and the bridges resting on them, that the corporation complains; and to enjoin the city from closing the draws for the morning and evening hours designated, and enforcing the ten minutes' limitation, and to compel the removal of the objectionable piers and bridges, the present bill is filed.

The river and its branches are entirely within the State of Illinois, and all of it, and nearly all of both branches that is navigable, are within the limits of the city of Chicago. The river, from the junction of its two branches to the lake, is about three-fourths of a mile in length. The branches flow in opposite directions and meet at its head, nearly at right angles with it. Originally the width of the river and its branches seldom exceeded one hundred and fifty feet; of the branches and fork it was often less than one hundred feet; but it has been greatly enlarged by the city for the convenience of its commerce.

The city fronts on Lake Michigan, and the mouth of the Chicago River is near its centre. The river and its branches divide the city into three sections; one lying north of the main river and east of its north branch, which may be called its northern division; one lying between the north and south branches, which may be called its western division; and one lying south of the main river and east of the south branch, which may be called its southern division. Along the river and its branches the city has grown up into magnificent proportions, having a population of six hundred thousand souls. Running back from them on both sides are avenues and streets lined with blocks of edifices, public and private, with stores and warehouses, and the immense variety of buildings suited for the residence and the business of this vast population. These avenues and streets are connected by a great number of bridges, over which there is a constant passage of foot-passengers and of vehicles of all kinds. A slight impediment to the movement causes the stoppage of a crowd of passengers and a long line of vehicles.

The main business of the city, where the principal stores, warehouses, offices, and public buildings are situated, is in the southern division of the city; and a large number of the persons who do business there reside in the northern or the western division, or in the suburbs.

While this is the condition of business in the city on the land, the river and its branches are crowded with vessels of all kinds, sailing craft and steamers, boats, barges, and tugs, moving backwards and forwards, and loading and unloading. Along the banks there are docks, warehouses, elevators, and all the appliances for shipping and reshipping goods. To these vessels the unrestricted navigation of the river and its branches is of the utmost importance; while to those who are compelled to cross the river and its branches the bridges are a necessity. The object of wise legislation is to give facilities to both, with the least obstruction to either. This the city of Chicago has endeavored to do.

The State of Illinois, within which, as already mentioned, the river and its branches lie, has vested in the authorities of the city jurisdiction over bridges within its limits, their con-

struction, repair, and use, and empowered them to deepen, widen, and change the channel of the stream, and to make regulations in regard to the times at which the bridges shall be kept open for the passage of vessels.

Acting upon the power thus conferred, the authorities have endeavored to meet the wants of commerce with other States, and the necessities of the population of the city residing or doing business in different sections.    For this purpose they have prescribed as follows: that "Between the hours of six and seven o'clock in the morning, and half-past five and half-past six o'clock in the evening, Sundays excepted, it shall be unlawful to open any bridge within the city of Chicago;" and that "During the hours between seven o'clock in the morning and half-past five o'clock in the evening, it shall be unlawful to keep open any bridge within the city of Chicago for the purpose of permitting vessels or other crafts to pass through the same, for a longer period at any one time than ten minutes, at the expiration of which period it shall be the duty of the bridge-tender or other person in charge of the bridge to display the proper signal, and immediately close the same, and keep it closed for fully ten minutes for such persons, teams, or vehicles as may be waiting to pass over, if so much time shall be required; when the said bridge shall again be opened (if necessary for vessels to pass) for a like period, and so on alternately (if necessary) during the hours last aforesaid; and in every instance where any such bridge shall be open for the passage of any vessel, vessels. or other craft, and closed before the expiration of ten minutes from the time of opening, said bridge shall then, in every such case, remain closed for fully ten minutes, if necessary, in order to allow all persons, teams, and vehicles in waiting to pass over said bridge."

The first of these requirements was called for to accommodate clerks, apprentices, and laboring men seeking to cross the bridges, at the hours named, in going to and returning from their places of labor.    Any unusual delay in the morning would derange their business for the day, and subject them to a corresponding loss of wages.    At the hours specified there is three times — so the record shows — the usual number of pedestrians going and returning that there is during other hours.

The limitation of ten minutes for the passage of the draws by vessels seems to have been eminently wise and proper for the protection of the interests of all parties. Ten minutes is ample time for any vessel to pass the draw of a bridge, and the allowance of more time would subject foot-passengers, teams, and other vehicles to great inconvenience and delays.

The complainant principally objects to this ten minutes' limitation, and to the assignment of the morning and evening hour to pedestrians and vehicles. It insists that the navigation of the river and its branches should not be thus delayed ; and that the rights of commerce by vessels are paramount to the rights of commerce by any other way.

But in this view the complainant is in error. The rights of each class are to be enjoyed without invasion of the equal rights of others. Some concession must be made on every side for the convenience and the harmonious pursuit of different occupations. Independently of any constitutional restrictions, nothing would seem more just and reasonable, or better designed to meet the wants of the population of an immense city, consistently with the interests of commerce, than the ten minutes' rule, and the assignment of the morning and evening hours which the city ordinance has prescribed.

The power vested in the general government to regulate interstate and foreign commerce involves the control of the waters of the United States which are navigable in fact, so far as it may be necessary to insure their free navigation, when by themselves or their connection with other waters they form a continuous channel for commerce among the States or with foreign countries. *The Daniel Ball*, 10 Wall. 557. Such is the case with the Chicago River and its branches. The common-law test of the navigability of waters, that they are subject to the ebb and flow of the tide, grew out of the fact that in England there are no waters navigable in fact, or to any great extent, which are not also affected by the tide. That test has long since been discarded in this country. Vessels larger than any which existed in England, when that test was established, now navigate rivers and inland lakes for more than a thousand miles beyond the reach of any tide. That test only becomes important when considering the rights of riparian owners to

the bed of the stream, as in some States it governs in that matter.

The Chicago River and its branches must, therefore, be deemed navigable waters of the United States, over which Congress under its commercial power may exercise control to the extent necessary to protect, preserve, and improve their free navigation.

But the States have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience, and prosperity of their people. . This power embraces the construction of roads, canals, and bridges, and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority. They are the first to see the importance of such means of internal communication, and are more deeply concerned than others in their wise management. Illinois is more immediately affected by the bridges over the Chicago River and its branches than any other State, and is more directly concerned for the prosperity of the city of Chicago, for the convenience and comfort of its inhabitants, and the growth of its commerce. And nowhere could the power to control the bridges in that city, their construction, form, and strength, and the size of their draws, and the manner and times of using them, be better vested than with the State, or the authorities of the city upon whom it has devolved that duty. When its power is exercised, so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction. If the power of the State and that of the Federal government come in conflict, the latter must control and the former yield. This necessarily follows from the position given by the Constitution to legislation in pursuance of it, as the supreme law of the land. But until Congress acts on the subject, the power of the State over bridges across its navigable streams is plenary. This doctrine has been recognized from the earliest period, and approved in repeated cases, the most notable of which are *Willson* v. *The Black Bird Creek Marsh Co.,* 2 Pet. 245, decided in 1829, and *Gilman* v. *Philadelphia*, 3 Wall. 713, decided in 1865. In the first of these cases, an act of Delaware incorporated the com-

pany, and authorized it to construct over one of the small navigable rivers of the State a dam which obstructed the navigation of the stream. A sloop, licensed and enrolled according to the navigation laws of the United States, broke and injured the dam, and thereupon an action was brought for damages by the company. The owners of the sloop set up that the river was a public and common navigable creek " in the nature of a highway," in which the tides had always flowed and reflowed, and in which there was, and of right ought to be, a common and public way for all the citizens of the State of Delaware and of the United States, with sloops and other vessels to navigate at all times of the year at their free will and pleasure ; that the company had wrongfully erected the dam across the navigable creek and thereby obstructed the same ; and that they had broken the dam in order to pass along the creek with their sloop. To this plea the company demurred, and the demurrer was sustained by the Court of Appeals of Delaware and by this court. The decision here was based entirely upon the absence of any legislation of Congress upon the subject. Said Chief Justice Marshall, speaking for the court : " The measure authorized by this act (of Delaware) stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. The counsel for the plaintiffs in error insist that it comes in conflict with the power of the United States ' to regulate commerce with foreign nations and among the several States.' If Congress had passed any act which bore upon the case ; any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks, into which the tide flows, and which abound throughout the lower country of the middle and southern States, we should feel not much difficulty in saying that a State law, coming in conflict with such act, would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power of Congress to regulate commerce with foreign nations and among the several

States, a power which has not been so exercised as to affect the question."

.The second case mentioned, that of *Gilman* v. *Philadelphia,* is equally emphatic and decisive.   The complaint there was by a citizen of New Hampshire, who owned valuable coal wharves on the Schuylkill River at Philadelphia, just above Chestnut Street in that city.   In 1857 the legislature of the State authorized the city of Philadelphia to erect a permanent bridge over the river at that street.   The city being about to begin the structure, which was to be without a draw, Gilman filed a bill to prevent its erection, alleging that it would be an unlawful obstruction of the navigation of the river, and an illegal interference with his rights, and a public nuisance, producing to him special damage, and that it was not competent for the legislature of Pennsylvania to sanction such a structure ; and he claimed that he was entitled to be protected by an injunction to stay the progress of the work, and to a decree of abatement, if it should be proceeded with to completion.   It appeared that the river was tide-water, and navigable to his wharves for vessels drawing from eighteen to twenty feet of water, and that for many years commerce to them had been carried on in all kinds of vessels.   The bridge, which was to be constructed below them, was to be only thirty feet high ; hence would not permit the passage of vessels with masts.   The city justified its proposed action by the act of the legislature, alleging that the bridge was a necessity for public convenience, a large population residing on both sides of the river.   The Circuit Court dismissed the bill, and this court affirmed the decree, holding that as the river was wholly within her limits, the State had not exceeded the bounds of her authority, and that until the dormant power of the Constitution was awakened and made effective by appropriate legislation, the reserved power of the State was plenary, and its exercise in good faith could not be made the subject of review by the court.   In its opinion, after observing " that it must not be forgotten that bridges, which are connecting parts of turnpikes, streets, and railroads, are means of commercial transportation as well as navigable waters, and that the commerce which passed over a bridge may be much greater than would ever be transported on the water

obstructed," the court said, speaking by Mr. Justice Swayne: "It is for the municipal power to weigh the considerations which belong to the subject and to decide which shall be preferred, and how far either shall be made subservient to the other. The States have always exercised this power, and from the nature and objects of the two systems of government, they must always continue to exercise it, subject, however, in all cases, to the paramount authority of Congress, whenever the power of the State shall be exerted within the sphere of the commercial power which belongs to the nation."

These decisions have been cited, approved, and followed in many cases, notably in that of *Pound* v. *Turck*, decided in 1877. 95 U. S. 459. There, a statute of Wisconsin authorized the erection of one or more dams across the Chippewa River, which was a small navigable stream lying wholly within the limits of the State, but emptying its waters into the Mississippi; and also the building and maintaining of booms on the river with sufficient piers to stop and hold floating logs. The dams and booms were to be so built as not to obstruct the running of lumber-rafts on the river. Certain parties were damaged by delay in a lumber-raft and from its breaking, caused by the obstructions in the river; and their assignees in bankruptcy brought an action against those who had placed the obstructions there, and recovered. The case being brought here, this court was of opinion that the somewhat confused instructions of the Circuit Court must have led the jury to understand, that if the structures of the defendant were a material obstruction to the general navigation of the river, the statute of the State afforded no defence, although the structures were built in strict conformity with its provisions. The Circuit Court evidently acted upon the theory that the State possessed no power to pass the statute because of its supposed conflict with the commercial power of Congress. This court thus construing the instructions of that court, held that they were erroneous, that the case was within the decisions of the Black Bird Creek Marsh case, and *Gilman* v. *Philadelphia*, and that it was competent for the legislature of the State to impose such regulations and limitations upon the erection of obstructions like dams and booms in navigable streams wholly

within its limits, as might best accommodate the interests of' all concerned, until Congress should interfere and by appropriate legislation control the matter.

The doctrine declared in these several decisions is in accordance with the more general doctrine now firmly established, that the commercial power of Congress is exclusive of State authority only when the subjects upon which it is exercised are national in their character, and admit and require uniformity of regulation affecting alike all the States. Upon such subjects only that authority can act which can speak for the whole country. Its non-action is therefore a declaration that they shall remain free from all regulation. *Welton* v. *State of Missouri*, 91 U. S. 275; *Henderson* v. *Mayor of New York*, 92 id. 259; *County of Mobile* v. *Kimball*, 102 id. 691.

On the other hand, where the subjects on which the power may be exercised are local in their nature or operation, or constitute mere aids to commerce, the authority of the State may be exerted for their regulation and management until Congress interferes and supersedes it. As said in the case last cited: " The uniformity of commercial regulations which the grant to Congress was designed to secure against conflicting State provisions, was necessarily intended only for cases where such uniformity is practicable. Where, from the nature of the subject or the sphere of its operation, the case is local and limited, special regulations, adapted to the immediate locality, could only have been contemplated. State action upon such subjects can constitute no interference with the commercial power of Congress, for when that acts the State authority is superseded. Inaction of Congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the States and requiring uniformity of regulation, is not to be taken as a declaration that nothing shall be done in respect to them, but is rather to be deemed a declaration that for the time being and until it sees fit to act they may be regulated by State authority."

Bridges over navigable streams, which are entirely within the limits of a State, are of the latter class. The local authority can better appreciate their necessity, and can better direct the manner in which they shall be used and regulated than a gov-

ernment at a distance. It is, therefore, a matter of good sense and practical wisdom to leave their control and management with the States, Congress having the power at all times to interfere and supersede their authority whenever they act arbitrarily and to the injury of commerce.

It is, however, contended here that Congress has interfered, and by its legislation expressed its opinion as to the navigation of Chicago River and its branches; that it has done so by acts recognizing the ordinance of 1787, and by appropriations for the improvement of the harbor of Chicago.

The ordinance of 1787 for the government of the territory of the United States northwest of the Ohio River, contained in its fourth article a clause declaring that, " The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between them, shall be common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States and those of any other States that may be admitted into the confederacy, without any tax, impost, or duty therefor."

The ordinance was passed July 13, 1787, one year and nearly eight months before the Constitution took effect; and although it appears to have been treated afterwards as in force in the territory, except as modified by Congress, and by the act of May 7, 1800, c. 41, creating the Territory of Indiana, and by the act of Feb. 3, 1809, c. 13, creating the Territory of Illinois, the rights and privileges granted by the ordinance are expressly secured to the inhabitants of those Territories; and although the act of April 18, 1818, c. 67, enabling the people of Illinois Territory to form a constitution and State government, and the resolution of Congress of Dec. 3, 1818, declaring the admission of the State into the Union, refer to the principles of the ordinance according to which the constitution was to be formed, its provisions could not control the authority and powers of the State after her admission. Whatever the limitation upon her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a State of the Union. On her admission she at once became entitled to and

possessed of all the rights of dominion and sovereignty which belonged to the original States. She was admitted, and could be admitted, only on the same footing with them. The language of the resolution admitting her is " on an equal footing with the original States *in all respects whatever.*" 3 Stat. 536. Equality of constitutional right and power is the condition of all the States of the Union, old and new. Illinois, therefore, as was well observed by counsel, could afterwards exercise the same power over rivers within her limits that Delaware exercised over Black Bird Creek, and Pennsylvania over the Schuylkill River. *Pollard's Lessee* v. *Hagan,* 3 How. 212; *Permoli* v. *First Municipality,* id. 589; *Strader* v. *Graham,* 10 id. 82.

But aside from these considerations, we do not see that the clause of the ordinance upon which reliance is placed materially affects the question before us. That clause contains two provisions : one, that the navigable waters leading into the Mississippi and the St. Lawrence shall be common highways to the inhabitants ; and the other, that they shall be forever free to them without any tax, impost, or duty therefor. The navigation of the Illinois River is free, so far as we are informed, from any tax, impost, or duty, and its character as a common highway is not affected by the fact that it is crossed by bridges. All highways, whether by land or water, are subject to such crossings as the public necessities and convenience may require, and their character as such is not changed, if the crossings are allowed under reasonable conditions, and not so as to needlessly obstruct the use of the highways. In the sense in which the terms are used by publicists and statesmen, free navigation is consistent with ferries and bridges across a river for the transit of persons and merchandise as the necessities and convenience of the community may require. In *Palmer* v. *Commissioners of Cuyahoga County* we have a case in point. There application was made to the Circuit Court of the United States in Ohio for an injunction to restrain the erection of a drawbridge over a river in that State on the ground that it would obstruct the navigation of the stream and injure the property of the plaintiff. The application was founded on the provision of the fourth article of the ordinance mentioned. The court, which was presided over by Mr. Justice McLean,

then having a seat on this bench, refused the injunction, observing that " This provision does not prevent a State from improving the navigableness of these waters, by removing obstructions, or by dams and locks, so increasing the depth of the water as to extend the line of navigation. Nor does the ordinance prohibit the construction of any work on the river which the State may consider important to commercial intercourse. A dam may be thrown over the river, provided a lock is so constructed as to permit boats to pass with little or no delay, and without charge. A temporary delay, such as passing a lock, could not be considered as an obstruction prohibited by the ordinance." And again : " A drawbridge across a navigable water is not an obstruction. As this would not be a work connected with the navigation of the river, no toll, it is supposed, could be charged for the passage of boats. But the obstruction would be only momentary, to raise the draw ; and as such a work may be very important in a general intercourse of a community, no doubt is entertained as to the power of the State to make the bridge." 3 McLean, 226. The same observations may be made of the subsequent legislation of Congress declaring that navigable rivers within the Territories of the United States shall be deemed public highways. Sect. 9 of the act of May 18, 1796, c. 29 ; sect. 6 of the act of March 26, 1804, c. 35.

As to the appropriations by Congress, no money has been expended on the improvement of the Chicago River above the first bridge from the lake, known as Rush Street Bridge. No bridge, therefore, interferes with the navigation of any portion of the river which has been thus improved. But, if it were otherwise, it is not perceived how the improvement of the navigability of the stream can affect the ordinary means of crossing it by ferries and bridges. The free navigation of a stream does not require an abandonment of those means. To render the action of the State invalid in constructing or authorizing the construction of bridges over one of its navigable streams, the general government must directly interfere so as to supersede its authority and annul what it has done in the matter.

It appears from the testimony in the record that the money appropriated by Congress has been expended almost exclu-

sively upon what is known as the outer harbor of Chicago, a part of the lake surrounded by breakwaters. The fact that formerly a light-house was erected where now Rush Street bridge stands in no respect affects the question. A ferry was then used there; and before the construction of the bridge the site as a light-house was abandoned. The existing light-house is below all the bridges. The improvements on the river above the first bridge do not represent any expenditure of the government.

From any view of this case, we see no error in the action of the court below, and its decree must accordingly be

*Affirmed.*