## NEW ORLEANS STEAMSHIP ASSOCIATION

v.

## PLAQUEMINES PORT, HARBOR & TERMINAL DISTRICT.

### Civ. A. No. 87–2548.

United States District Court,
E.D. Louisiana.

June 15, 1988.

Edward S. Bagley of Terriberry, Carroll & Yancey, New Orleans, La., for plaintiff.

Louis B. Porterie, Robert E. Fontenelle, Jr., New Orleans, La., Edward J. Sheppard of Schmeltzer, Aptaker & Sheppard, Washington, D.C., for defendant.

SEAR, District Judge.

This action by the New Orleans Steamship Association (NOSA), a non-profit organization of owners, stevedores, and vessel agents, challenges the port and harbor dues imposed by the Plaquemines Port, Harbor and Terminal District (the Port) on the grounds that they violate the Harbor Development and Navigation Improvement Act of 1986, 33 U.S.C.A. secs. 2231–2241; the statute admitting Louisiana into the Union, 33 U.S.C.A. sec. 10; the U.S. Constitution, Art. I, sec. 10, cl. 2 (prohibiting imposts or duties on imports or exports); the U.S. Constitution, Art. I, sec. 10, cl. 3 (prohibiting duty of tonnage); and the U.S. Constitution, Art. I, sec. 8 (commerce clause).

The plaintiff seeks injunctive and declaratory relief.

The constitutionality of the Port's tariffs was first challenged in 1978 but not determined.[1] Instead, in 1980 the case was stayed to allow the Federal Maritime Commission to determine a complaint filed by Louis Dreyfus Corporation challenging the same tariff, pursuant to 46 U.S.C.A. App. sec. 821.[2] The Federal Maritime Commis-

---

1. *Louis Dreyfus Corporation v. Plaquemines Port, Harbor and Terminal District, et al.,* No. 78–860 and consolidated cases (E.D.La. filed March 15, 1978). The parties agreed to dismiss this case in 1983, after the FMC rendered its opinion in the parallel proceedings.

2. This section provides that:
   (a) Any person may file with the Federal Maritime Commission a sworn complaint setting forth any violation of this chapter by a common carrier by water in interstate commerce, or other person subject to this chapter, and asking reparation for the injury, if any, caused thereby. The Commission shall furnish a copy of the complaint to such carrier or other person, who shall, within a reasonable time specified by the Commission, satisfy the complaint or answer it in writing. If the complaint is not satisfied the Commission shall, except as otherwise provided in this chapter, investigate it in such manner and by such means, and make such order as it deems proper. The Commission, if the complaint is

sion (the FMC) has jurisdiction to regulate the imposition of rates or charges by persons "carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water in interstate commerce." 46 U.S.C.A. App. secs. 801 and 816 (West Supp.1988).[3]

The Commission found the tariff to be in violation of the Shipping Act of 1916, 46 U.S.C.A. App. secs. 801–842.[4] The Port appealed the FMC's order to the Court of Appeals for the District of Columbia Circuit, but the parties settled the matter before a decision was rendered. Under the terms of the settlement, the Port refunded 80% of the fees assessed and held hearings on the redrafting of the contested tariff provisions.

The Port published a new tariff in 1982. NOSA challenged this tariff before the FMC.[5] NOSA contended that the tariff violated the Shipping Acts of 1916 and 1984, 46 U.S.C.A. App. secs. 801 et seq. and 46 U.S.C.A. App. secs. 1701 et seq. respectively, because it gave preferential treatment to non-oceangoing vessels. NOSA also challenged the tariff as violative of the tonnage clause of the U.S. Constitution. The FMC ruled that the imposition of the tariff was consistent with the 1916 and 1984 Shipping Acts, but that the allocation of fees among users was discriminatory. The FMC declined to reach the tonnage clause issue. NOSA then filed an action in the Eastern District of Louisiana to enforce the FMC's ruling and to enjoin the Port

from collecting any more fees under the 1982 tariff.[6] Concurrently, the Port appealed the FMC's order to the Court of Appeals for the District of Columbia Circuit.

In October 1986 the Port filed a revised tariff eliminating the provisions found discriminatory by the FMC. The FMC shortly thereafter formally approved the tariff. Since the revised tariff complied with the FMC's order, the Port moved to dismiss the action filed by NOSA in the district court to enforce the FMC's ruling. The district court found that the filing and approval of the october 1986 tariff rendered NOSA's claim for injunctive relief moot.[7] NOSA appealed on the grounds that viable issues remained in the action. The Fifth Circuit agreed that if the Port sought to collect tariffs assessed during the time between the FMC's September 16, 1986 order and the adoption of the new tariff on October 15, 1986, NOSA would be entitled to injunctive relief. *New Orleans S.S. Ass'n v. Plaquemines Port Harbor*, 816 F.2d 1074, 1077 (5th Cir.1987). However, the court affirmed the district court's dismissal of NOSA's action finding that:

No current, justiciable violation of a Commission order is alleged. Although assessments may have been made during the lapse period, there is nothing in the record before us to suggest that the District is presently undertaking, or is likely to undertake steps to collect any illegally assessed charges. Such conduct must be established before injunctive relief may

---

filed within two years after the cause of action accrued, may direct the payment, on or before a day named, of full reparation to the complainant for the injury caused by such violation.

(b) The Commission, upon its own motion, may in like manner and, with the same powers, investigate any violation of this chapter. 46 U.S.C.A. App. sec. 821 (West Supp.1988).

**3. 816. Just and reasonable regulations and practices; supervision by Commission**

Every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Commission finds that any such regulation or practice is unjust or unreasonable it

may determine, prescribe, and order enforced a just and reasonable regulation or practice. 46 U.S.C.A.App. sec. 816 (West 1988).

**4.** *Louis Dreyfus Corp. v. Plaquemines Port, Harbor and Terminal District*, 21 S.R.R. 219 (I.D. 1981), *adopted* 21 S.R.R. 1072 (F.M.C.1982).

**5.** *New Orleans Steamship Association v. Plaquemines Port, Harbor and Terminal District*, Docket No. 83–2 (F.M.C. Sept. 16, 1986).

**6.** *New Orleans Steamship Association v. Plaquemines Port, Harbor and Terminal District*, Civ. No. 86–4238 (E.D.La. filed September 29, 1986).

**7.** *New Orleans Steamship Assoc. v. Plaquemines Port, Harbor and Terminal District*, Civ. No. 86–4238 (E.D.La. Jan. 15, 1987).

be considered. We agree with the district court that the heavy hand of injunctive relief would not be "proper" in this case. *Id.* at 1078.

Subsequently, NOSA filed this action for declaratory and injunctive relief challenging the constitutionality of the revised tariff. NOSA urged new grounds for relief in this suit, that the tariff violated the Harbor Development & Navigation Improvement Act of 1986 and the statute admitting Louisiana into the Union, 33 U.S.C. sec. 10, and raised constitutional challenges based on the commerce, tonnage and import/export clauses of the U.S. Constitution.

The plaintiff and defendant agreed that the merits of the action could be disposed of on the record before the Court in summary motions. The plaintiff moved for summary judgment and the defendant moved to dismiss.

Concurrently, however, the parties raised the lawfulness of the previous tariff under the Harbor Development and Navigation Improvement Act, the statute admitting Louisiana into the Union, the commerce clause and tonnage clause, in the appeal of the FMC September 16, 1986 order before the Court of Appeals for the District of Columbia Circuit. The District of Columbia Circuit affirmed the FMC's order in all respects. *See Plaquemines Port, Harbor and Terminal District v. Federal Maritime Commission and United States of America,* 838 F.2d 536 (D.C.Cir.1988). The court reached the tonnage clause issue and determined that the tariff did not violate that clause of the Constitution. However, the court declined to decide the lawfulness of the tariff under the Harbor Development and Navigation Improvement Act, the

commerce clause, the import/export clause and the statute admitting Louisiana to the Union, 33 U.S.C. sec. 10, because they were improperly raised in NOSA's supplemental brief. *Id.* at 27. The court also stated that it could not decide the constitutional claims even if it wanted to, since it had no factual record before it. The court suggested that those claims were better brought in this forum. Accordingly, NOSA has filed for leave to amend the complaint challenging the constitutionality of the previous tariff under the commerce clause, the import/export clause, the statute admitting Louisiana into the union, 33 U.S.C. sec. 10, and the Harbor Development and Navigation Act. The Port opposed the motion.

At issue in the motions presently before the Court is whether:

1. the new tariff violates the tonnage clause;

2. the new tariff violates the commerce clause;

3. the new tariff violates the Harbor Development and Navigation Improvement Act;

4. the new tariff violates the import/export clause;

5. the new tariff violates the statute admitting Louisiana into the Union, 33 U.S.C. sec. 10.

The plaintiff is not challenging "the reasonableness of the charges of the District from the standpoint of their apportionment between oceangoing vessels and other interests, their overall relationship to the expenditures by Plaquemines, or on any other basis."[8]

THE TARIFF:

The tariff at issue is a "Harbor Fee"[9]

---

8. *Stipulation of Facts* at 4, Attachment to Doc. 12 at 225, Record.

9. The "harbor fee" is defined in the tariff as: All commercial cargo vessels which dock, moor, or anchor within the District shall be assessed a Harbor Fee per each arrival within the geographical limits of the District, to assist in defraying the expenses of the administration and maintenance of the port and harbor, including the supervision of the shipping of the port, with the view of preventing collisions and fires, policing the river and river-

front, providing services of all kinds as required for an orderly and safe port operation, including response to vessels in distress with the means available, and to aid in extinguishing fires on vessels and equipment and in the cargo aboard such vessels or upon the public wharves, public banks and battures of the waterways of the district, and in the harbor, and upon the private wharves, docks, and immediately adjacent facilities connected thereto without any additional charge (except for the cost of supplies, material and equip-

and "Supplemental Harbor Fee" [10] charged by the Port.[11] The Port assesses the Supplemental Harbor Fee against oceangoing vessels loading or discharging cargo in the Plaquemines District [12] (the District) at the rate of 2½ cents per ton for dry cargo and ½ cent per barrel for liquid cargo. The Harbor Fee is assessed for each day a vessel remains in the District, moored or at anchor, on a graduated scale based on the vessel's length. The Fee is waived for vessels that are detained in the District by fog for a period not exceeding 24 hours. The Fee is assessed at all anchorage sites established by the United States Coast Guard within the District and at private mooring facilities. Every oceangoing vessel serving any port on the Mississippi River must pass through the District both inbound and outbound.

The Port does not own, operate or provide any physical facilities in the form of docks, wharves or aids to navigation. All the terminal facilities alongside the river in the District are privately owned. The parties have stipulated that the fees are collected to provide emergency support services.[13] Those services are described as follows:

> Port District services in place and functioning are the operation of two patrol/rescue/early fire response vessels; a ferryboat that has built into it fire fighting pumping capacity and which can be enhanced by the placing of additional firefighting pumping equipment with special emphasis on snorkel nozzles for marine fire fighting; high speed, mobile pumps that can be towed at high speed along the highways adjacent to the river to points of loading the same on the ferryboats or other, prelocated barges, supply vessels or other vessels under a fire plan in place in conjunction with the voluntary fire departments of the District so as to be available for marine, vessel, wharves, and facilities fire fighting. The Port District also provides a 24-hour a day marine communications network oriented to marine emergencies and current locations of Port District personnel and departmental persons (including commissioners who perform executive functions), the marine communications network facilities, fire and police protection services, and the alerting, dispatching and implementing of the protective efforts of local fire units and volunteer fire units who have in place a marine response plan, including fire protection and emergency response plan through an agreement of the Port District with the U.S. Coast Guard and an agreement for a reciprocal fire plan involving the Port of New Orleans fire vessels for providing them to the District's vessel, wharves, and facilities as early as possible in port emergencies.[14] There are reciprocal fire aid plans with adjacent fire districts in emergency situations.

*Preamble Part B, Tariff No. 1* at B-2, Appendix C to Reply of New Orleans

---

ment expended by the District in the performance of such services).
Section I, Tariff at 3, Appendix C to NOSA's Reply.

**10.** The Tariff defines the "supplemental harbor fee" as:

A fee charged to supplement revenue necessary for the purposes herein set forth under "Harbor Fee" based on the weight of non-liquid cargo and on barrels of liquid cargo handled or transferred in midstream or when anchored at or moored to any dock, wharf, or mooring facility, or at a public wharf if, in the future, the District has any public wharves, which it does not now have.
Section 1, Tariff at 3, Appendix C to NOSA's Reply.

**11.** The Plaquemines Port, Harbor & Terminal District is an entity created by the Louisiana legislature. La.R.S. 34:1351, *et seq.*

**12.** The Plaquemines Parish Port, Harbor and Terminal District is coterminous with Plaquemines Parish, Louisiana and encompasses approximately 120 miles of the Mississippi River between New Orleans and the Gulf of Mexico.

**13.** *Stipulation of Facts* at 3, Attachment to Doc. 12 at 225, Record.

**14.** *See* Memorandum of Understanding Between the Coast Guard, and the Plaquemines Parish Commission Council, approved by the Coast Guard September 4, 1979, providing for coordination of resources to fight fires on board vessels and at waterfront facilities, Appendix D to NOSA's Reply.

Steamship Association to Memorandum in Support of Motion to Dismiss (NOSA's Reply).

The tariff collected by the Port, then, is a fee for emergency support services provided by the Port for the benefit of the vessels travelling through the District.

■ The plaintiff contends that the Port lacks the authority to impose the tariff because such a tariff could only be imposed pursuant to the Harbor Development & Navigation Improvement Act of 1986, 33 U.S.C.A. secs. 2231–2241.

The Harbor Development & Navigation Improvement Act of 1986 (the Act) authorizes navigational improvements in harbors or inland harbors of the United States, 33 U.S.C.A. sec. 2232(a), and provides federal financing for harbor development projects implemented by non-federal interests if the projects meet the requirements of the Act. 33 U.S.C.A. sec. 2232(e).

It is uncontroverted that the Port has not undertaken any works pursuant to the provisions of the Act. The plaintiff nevertheless maintains that since the Port has not been authorized by the Act to impose the tariff, it is in violation of the Act's strictures. The plaintiff relies on section 2236 of the Act which provides:

(a) **Consent of Congress**

Subject to the following conditions, a non-Federal interest may levy port or harbor dues (in the form of tonnage duties or fees) on a vessel engaged in trade entering or departing from a harbor and on cargo loaded on or unloaded from that vessel under clauses 2 and 3 of section 10, and under clause 3 of section 8, of Article 1 of the Constitution:

(1) **Purposes**

Port or harbor dues may be levied only in conjunction with a harbor navigation project whose construction is complete (including a usable increment of the project) and for the following purposes and in amounts not to exceed those necessary to carry out those purposes:

(A)(i) to finance the non-Federal share of construction and operation and maintenance costs of a navigation

project for a harbor under the requirements of section 2211 of this title; or

(ii) to finance the cost of construction and operation and maintenance of a navigation project for a harbor under section 2232 or 2233 of this title; and

(B) provide emergency response services in the harbor, including contingency planning, necessary personnel training, and the procurement of equipment and facilities.

(2) **Limitation on port or harbor dues for emergency service**

Port or harbor dues may not be levied for the purposes described in paragraph (1)(B) of this subsection after the dues cease to be levied for the purposes described in paragraph (1)(A) of this subsection.

33 U.S.C.A. sec. 2236 (West Supp.1988).

However, the plain language of the provision makes it clear that it applies only to port or harbor dues that are imposed "only in conjunction with a harbor navigation project whose construction is complete ... to finance the non-Federal share of construction and operation and maintenance costs of a navigation project ... and ... to provide emergency response services in the harbor" on navigation projects implemented pursuant to the provisions of the Act. Since the Port has not undertaken the construction or implementation of any project under the Act, the Act does not apply to the harbor fees assessed by the Port to provide emergency support services for the District. Nothing in the Act, therefore, prevents the Port from charging a fee to ocean-going vessels to pay for emergency support vessels.

■ Contrary to the plaintiff's contention, moreover, the Act does not constitute the sole authority for imposition of port and harbor dues. In *Clyde Mallory Lines v. State of Alabama*, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935), the Supreme Court recognized that states had the authority to assess reasonable fees on vessels to defray the costs of providing services to insure the safety and facilitate the movement of vessels using its harbors. *Id.* at 265–67, 56 S.Ct. at 195–97. The Court up-

held a fee imposed by the Port of Mobile, Alabama to defray the expenses of supervising the harbor to insure the safety and facility of the movement of vessels. *Id.* at 265–66, 56 S.Ct. at 195–96. In assessing the Harbor Fee and Supplemental Harbor Fee, the Port is exercising an authority recognized in a long line of Supreme Court cases that has not been eradicated by the passage of the Harbor Development and Navigation Improvement Act of 1986.

The thrust of that Act is to facilitate harbor development by providing for "the study, design, and construction of harbor projects by non-Federal interest[s] (sic) and, under certain circumstances, allowing Federal participation in the funding of such projects." H.R.Conf.Rep. No. 99–1013, 99th Cong., 2d Sess. 209, *reprinted in* 1986 U.S. Code Cong. & Admin.News 6639, 6723, 6730. Nothing in the Act indicates an intent by Congress to overrule *Clyde Mallory* and to restrict the manner in which states may impose harbor fees, *unless the fees are imposed to finance a new construction project developed pursuant to the Act.*

■ Having found that the Port's tariff does not come within the scope of the Act and that the state has the authority to impose the tariff to defray the costs of providing emergency support services in the District, I turn to the plaintiff's contention that the tariff violated the statute which admitted Louisiana to the Union, 33 U.S.C.A. sec. 10. That statute provides simply that "[a]11 the navigable rivers and waters in the former Territories of Orleans and Louisiana shall be and forever remain public highways."

The Supreme Court interpreted this statute in *Hamilton v. Vicksburg, S. & P.R. Co.*, 119 U.S. 280, 7 S.Ct. 206, 30 L.Ed. 393 (1886) and held that it did not impair the power which the state could exercise over its rivers. The Court affirmed the doctrine it had established in *Escanaba Co. v. Chicago*, 107 U.S. (17 Otto) 678, 2 S.Ct. 185, 27 L.Ed. 442 (1883), that:

> [I]f we treat the clause as divisible into two provisions, they must be construed together as having but one object, namely, to insure a highway equally open to all, without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of any toll for their navigation; and that the clause contemplated no other restriction upon the power of the state in authorizing the construction of bridges over them, whenever such construction would promote the convenience of the public.

*Hamilton v. Vicksburg*, 119 U.S. at 285, 7 S.Ct. at 208. In *Escanaba*, the Court held that the commerce clause was not violated by Illinois' exercise of power over bridges across its navigable streams. *Id.*

The Supreme Court clarified the extent of the state's powers when it interpreted a similar statute to refer to rivers and waters in their natural state:

> The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. The provision of the clause that the navigable streams should be highways without any tax, impost, or duty, has reference to their navigation in their natural state. It did not contemplate that such navigation might not be improved by artificial means, by the removal of obstructions, or by the making of dams for deepening the waters, or by turning into the rivers waters from other streams to increase their depth. For outlays caused by such works the State may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels.
>
> •   •   •   •   •
>
> By the terms tax, impost, and duty, mentioned in the ordinance, is meant a charge for the use of the government, not compensation for improvements.

*Huse v. Glover*, 119 U.S. 543, 548–49, 7 S.Ct. 313, 315–16, 30 L.Ed. 487 (1886). In *Huse*, the Court upheld the imposition of tolls according to the tonnage of a vessel to

defray the cost of constructing a lock and dam on the Illinois river under attack as violative of the tonnage clause and the Ordinance of 1787, a statute almost identical to the statute admitting Louisiana into the Union.[15] The Court distinguished emphatically between tolls imposed merely for navigation and charges that constituted compensation for improvements and found that the statute's requirement that rivers be kept as public highways prohibited only the former and not the latter. *See also Cardwell v. American River Bridge Co.,* 113 U.S. 205, 5 S.Ct. 423, 28 L.Ed. 959 (1885) (act of September 9, 1850 admitting California as a state into the Union[16] construed only "to insure a highway equally open to all without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the *exaction of any toll for their navigation;* and that the clause contemplated no other restriction upon the power of the state in authorizing the construction of bridges over them whenever such construction would promote the convenience of the public," *id.* at 212, 5 S.Ct. at 426 (emphasis added)). The statute's intent is to preserve passage over the state's waterways to all, prohibiting the imposition of a charge for the mere privilege of passage; the Port's tariff meets this requirement and does not deter free passage on the river. Instead, it exacts a reasonable fee from those who dock in the District to ensure the safe passage of all. Nothing in the statute admitting Louisiana into the Union, therefore, prohibits the Port from imposing a reasonable fee upon vessels travelling in the District to defray the costs of providing emergency support services.

The plaintiff contends that the tariff violates the commerce clause, the tonnage clause and the import/export clause to the U.S. Constitution. However, charges levied to defray the cost of services that do not hamper, but indeed, aid interstate commerce, have consistently been upheld by the Supreme Court. *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935); *Huse v. Glover,* 119 U.S. 543, 7 S.Ct. 313, 30 L.Ed. 487 (1886); *Hamilton v. Vicksburg,* 119 U.S. 280, 7 S.Ct. 206, 30 L.Ed. 393 (1886); *Cardwell v. American River Bridge Co.,* 113 U.S. 205, 5 S.Ct. 423, 28 L.Ed. 959 (1885); *Escanaba Co. v. Chicago,* 107 U.S. (17 Otto) 678, 2 S.Ct. 185, 27 L.Ed. 442 (1883); *Indiana Port Commission v. Bethlehem Steel Corp.,* 534 F.Supp. 858 (N.D.Ind.1981). Further, the plaintiff's challenge ignores the clear principle of the commerce clause that only unreasonable burdens on interstate commerce by a state will be struck down. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) ("Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*). As the Court in *Clyde Mallory* noted:

The present fee to defray the cost of a purely local regulation of harbor traffic is not an objectionable burden on commerce. State regulations of harbor traffic, although they incidentally affect commerce, interstate or foreign are of local concern. So long as they do not impede the free flow of commerce and are not made the subject of regulation by Congress they are not forbidden.... And charges levied by state authority to defray the cost of regulation or of facilities afforded in aid of interstate or for-

---

**15.** The fourth article of the ordinance of 1787 stated that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor." Northwest Ordinance, 1 Stat. 50, 52 (1787).

**16.** The act provided "that all the navigable waters within the said state shall be common highways and forever free, as well to the inhabitants of said state as to the citizens of the United States, without any tax, impost, or duty therefor." Act of September 9, 1850, 9 Stat. 454.

eign commerce have consistently been held to be permissible.

*Clyde Mallory,* 296 U.S. at 267, 56 S.Ct. at 197.

■ There is a dearth of evidence in the record to support a finding that the tariff imposes an excessive burden on interstate or foreign commerce. The Port's tariff is no more than an incidental burden on interstate commerce; the benefits to the vessels in providing emergency support services far outweigh any slight burden that may result. The Port's practice of assessing a fee for emergency support services does not violate the commerce clause.

As previously noted, the plaintiff's contention that the Harbor Development & Navigation Improvement Act declared Congress' intent to take away the plenary authority of a state over its rivers is simply not supported by the language and structure of the Act and its declared purpose— to address the method of financing new harbor projects. *See* Comments by Senator Stafford of Vermont, 144 Cong.Rec.S 16982 (daily ed. Oct. 17, 1986). On the contrary, the Act plainly restricts itself to navigation projects undertaken pursuant to the Act. Moreover, strongly indicative of Congress' desire to preserve the recognized powers of the states to impose reasonable charges on vessels to defray the costs of services to those vessels, is the Act's retention of the regulatory powers of the FMC over general port, harbor and terminal charges assessed to provide services like cargo handling, anchorage, etc. The Act requires that the tariffs imposed pursuant to the Act must likewise be filed with the FMC. 33 U.S.C.A. sec. 2236(a)(6)(A) (West Supp. 1988). There is no indication that Congress intended to do more than provide a new means of financing new harbor development projects. The Act does not constitute Congressional prohibition of state action in the area; nor does the Port's imposition of the tariff in any way conflict with the provisions or purposes of the Act. *See Jones v. Rath Packing Co.,* 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977). On the contrary, the Port collects the tariff to provide emergency services in collaboration with Coast Guard authorities, in effect relieving the burden that federal authorities charged with regulating and supervising national maritime activities carry. The Port's tariff is consistent with the existing federal scheme.

■ Further, imposition of the tariff does not violate the import-export clause.[17] The Court has identified the policies behind the clause as:

[A] concern than an impost or duty might interfere with the Federal Government's regulation of commercial relations with foreign governments; fear that on account of such state taxation the Federal Government would lose an important source of revenue; and a desire to maintain harmony among the States, which would be disturbed if seaboard States could tax goods "merely flowing through their ports" to other States not so favorably situated.

*R.J. Reynolds Tobacco Co. v. Durham County, N.C.,* 479 U.S. 130, 107 S.Ct. 499, 514, 93 L.Ed.2d 449 (1986) (quoting *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 285–86, 96 S.Ct. 535, 540–41, 46 L.Ed.2d 495 (1976)).

The Port's tariff does not interfere with the federal government's regulation of foreign commerce; it falls on foreign and domestic vessels alike and does not single out foreign vessels for unfavorable treatment. *See id.* Similar to the property tax upheld in *Reynolds,* the nature of the tariff in this case is "nothing more than a means 'by which a State apportions the cost of such services as police and fire protection among the beneficiaries....' " of the services. *Id.*

Although this Court recognizes the need for the federal government to speak with one voice when regulating commercial relations with foreign governments, *see Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), the Port's tariff is subject to review and regulation by the Federal Maritime

---

17. "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except...." U.S. Const., Art. I, sec. 10, cl. 2.

Commission. This suffices to ensure that the Port's assessment of harbor fees does not impose an unreasonable burden on foreign commerce.

 *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935) also sets forth the analysis for the tonnage clause challenge. Simply, the Supreme Court held that the tonnage clause does not prohibit charges made by a state for services rendered such as pilotage, wharfage, or charges for the use of locks. *Id.* at 265–66, 56 S.Ct. at 195–96. It is uncontroverted that the Port's tariff is a charge assessed on vessels that dock in the District to defray the costs of providing emergency support services to all vessels passing through the District. The Port's tariff, therefore, is not prohibited by the tonnage clause. Judge Bork's opinion in the appellate proceedings of the FMC's order discusses in depth the tonnage clause issue and I perceive there is little to add.

I find, therefore, that there are no statutory or constitutional bars to the Port's imposition of the Harbor Fee and Supplemental Harbor Fee. Accordingly, the plaintiff's claim is dismissed.